UNITED STATES of America, Appellee,

v.

**Amadio PETITO, Appellant.**

**No. 506, Docket 81–1333.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 15, 1981.

Decided Jan. 26, 1982.

Rehearing and Rehearing In Banc
Denied March 10, 1982.

Laura A. Brevetti, U. S. Atty., Organized Crime Strike Force, E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y. and Thomas P. Puccio, U. S. Dept. of Justice, Organized Crime Strike Force, E. D. N. Y., Brooklyn, N. Y., on brief), for appellee.

J. Jeffrey Weisenfeld, New York City, for appellant.

Before TIMBERS, KEARSE and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

During a grand jury investigation in the Eastern District of New York into illegal payoffs to union leaders of Local 29 of the Blasters, Drillrunners and Miners Union, appellant, Amadio Petito, an officer of that union, was called as a witness and refused to testify. The district court thereupon granted him immunity.[1] When appellant

---

1. 18 U.S.C. § 6002 provides:
   Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify...in a proceeding before...

(1) a court or grand jury of the United States,

. . . . .

still refused to testify after the grant of immunity, the district court advised him that he would "be held in custody for the life of the Grand Jury, or prior to that at such time as [he] may purge [him]self of contempt by testifying before the Grand Jury."

Subsequently convicted for criminal contempt and perjury, appellant has raised several issues for our consideration on this appeal. Principal among them is his assertion that the statement made to him by the district court led him to believe that the only result of his refusal to testify would be his liability for civil contempt, and that, upon appearing and testifying, no further consequences would be visited upon him. He claims that when held for civil contempt he was entitled—under notions of due process—to notice of the possibility that a charge could be laid against him for criminal contempt. Because we find this contention unpersuasive and the other issues raised without merit, we affirm the judgment of conviction.

## FACTS

In 1979 a Special Grand Jury in the United States District Court for the Eastern District of New York began an investigation to determine whether Louis Sanzo, president of Local 29 of the Blasters, Drillrunners and Miners Union, had received illegal payoffs during the years 1974 through 1979, and whether Samuel Cavalieri, who was not a union member, actually controlled Local 29 and shared in the payoffs to Sanzo. Appellant Petito, who was secretary-treasurer of Local 29 during part of this time, was called to testify before the grand jury on July 20, 1979. When asked questions concerning Samuel Cavalieri and Local 29, Petito refused to answer, invoked his Fifth Amendment privilege and requested immunity from prosecution based on his testimony. He also refused to testify without a court ruling on whether certain questions proposed to him were based on information obtained from illegal electronic surveillance.

Petito appeared with counsel before Judge Henry Bramwell on July 20th. At that time the prosecuting attorney submitted an order signed by a New York State Supreme Court Justice authorizing surveillance of Sanzo's telephone. The prosecutor acknowledged that Petito would be interrogated before the grand jury on matters derived from this wiretap. Ruling that the wiretap order was facially valid, Judge Bramwell granted Petito immunity and directed him to testify. The court also warned Petito that failure to testify truthfully might result in his prosecution for perjury.

Appellant reappeared before the grand jury on the same day. For the second time he refused to testify concerning Cavalieri and the union, asserted his Fifth Amendment privilege, and declined to answer questions based on the allegedly illegal interceptions of his telephone conversations with Sanzo. The prosecutor then advised Petito that he could no longer withhold his testimony on these grounds and that his further refusal to obey the court's order could result in his being held in contempt and incarcerated until he agreed to answer questions. The parties returned to Judge Bramwell who once again ordered Petito to testify. After conferring with his attorney, he responded that he would not. Judge Bramwell found Petito in contempt of court and made the statement previously quoted.

Appellant was held in custody for twenty-seven days. He next appeared before the grand jury on August 16, 1979, at which time he made a statement that he still objected to answering questions but would do so because a judge had ordered him to. He proceeded to respond to a number of inquiries about himself, Cavalieri, Sanzo and the union.

and the person presiding...communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order...may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

The grand jury interrogated him with respect to his whereabouts and activities following a union nomination meeting held on May 4, 1978. At first he stated that he could not presently recall exactly the events of one specific night some fifteen or sixteen months in the past. The inquiry focused on whether Petito had visited a social club on Second Avenue between 109th and 110th Streets run by Samuel Cavalieri. Petito stated that at that time his father lived in the vicinity of Cavalieri's social club and that he might have gone to visit his father after the meeting, but that he could not remember whether he did or not. He concluded with "I am telling you that I possibly, yes, I might have seen [Cavalieri], I might have been with my father, I don't know."

The following day, Petito stated that he wanted to change part of his previous testimony which he believed was incorrect. He then said

> I thought about it and I remember that I did not go [to Cavalieri's social club]...I mentioned to you that it was a possibility that if I did go to 109th Street it was a question of seeing my father who was alive at the time. But remembering after I left here, I had met my father outside of where we had this election...I remember meeting him and after the meeting and that's why I am saying now that I never went to 109th Street. Before I answered there was a possibility that I did or didn't. More or less the reason was to see my father, but I remember seeing my father outside of the election hall.

Petito later repeated that he did not go to Cavalieri's social club on May 4, 1978.

The grand jury filed an indictment on March 17, 1981 which charged Petito with criminal contempt[2] for willfully disobeying Judge Bramwell's order to testify after receiving a grant of immunity, and with perjury[3] for his August 17, 1979 testimony that he did not go to Cavalieri's social club.

To prove criminal contempt the government offered the court orders and grand jury transcripts detailing the above-described events of July 20, 1979. To support the perjury count the minutes of Petito's entire testimony before the grand jury on August 16 and 17, 1979 were admitted into evidence and portions were read to the trial jury. Additionally, William Dunn, a Special Investigator for the Nassau County District Attorney's Office, testified that on May 4, 1978 between 7:30 and 9:00 p. m. he conducted a surveillance outside of Cavalieri's social club in order to determine whether Petito, Sanzo and Cavalieri would attend a meeting there. Dunn had been provided with a description of Petito as being a person 5'7" tall, weighing 175 pounds, stocky, bald and clad in work clothes. Dunn testified that, using binoculars and standing about fifty yards away, he observed a man whom he identified in court as Petito cross the street and enter the social club at about 8:00 p. m. He also observed Sanzo and Cavalieri enter the club at approximately the same time. About forty minutes later he saw all three men exit the club and walk away together. Dunn instructed a photographer who accompanied him to take pictures of these individuals. He further testified that he saw and recognized Petito again in Sanzo's company two months later on July 6, 1978, at which time photographs were also taken. When later viewing these July 6th photos, Dunn confirmed his identification of Petito as the man he had seen on May 4, 1978 at Cavalieri's social club.

---

**2.** 18 U.S.C. § 401 provides:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none others, as

. . . . .

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

**3.** 18 U.S.C. § 1623(a) provides:

Whoever under oath...in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration...shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Appellant presented four witnesses. One testified that Petito arrived at his home in Port Washington, New York at 8:45 p. m. on May 4, 1978. Another said that he "hung around" the social club regularly, but did not see Petito there on May 4, 1978. A third stated that he owned a bakery adjacent to the club and did not see Petito on Second Avenue that evening. The last witness claimed that he saw Petito leave the union meeting hall at 8:00 p. m. in a car with Louis Sanzo and others.

Both before and during trial appellant requested discovery of the wiretap supporting papers of his telephone conversation with Sanzo or a hearing on the propriety of issuing the wiretap order. His requests were denied.

## DISCUSSION

### I

### Preindictment Notice of Possible Criminal Contempt Charge Is Not Required

Appellant has raised what appears to be an issue of first impression in this circuit. He contends that the statement the district court made to him after he had been granted immunity and still refused to testify, was in some way misleading. He claims the statement led him to believe that the only consequence of his conduct was civil contempt, and that there would be no further sanction if he testified.

■ This view of the law misreads the function of civil and criminal contempt. The one is coercive, to compel obedience to a lawful court order; the other is retributive, to punish for an offense against the public and to vindicate the power of the court. An individual who refuses obedience to a valid order is subject to both civil and criminal contempt for the same acts. *Yates*

v. *United States*, 355 U.S. 66, 74, 78 S.Ct. 128, 133, 2 L.Ed.2d 95, 102, (1957).

■ The power to impose coercive imprisonment in a civil contempt proceeding is limited by the individual's ability to comply with the court's order. When the grand jury is discharged, confinement for civil contempt must terminate because the possibility of compliance has ended. *Shillitani v. United States*, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622, 627–28 (1966).

■ Prosecution for criminal contempt rests on a different footing. The public interest in orderly government demands respect for compliance with court mandates. Thus, to disregard a court order may at the same time subject an individual civil contemnor to criminal contempt proceedings for his violation of the law. A trial court ordinarily first applies the coercive remedy of civil contempt and only makes use of the criminal sanction when the disobedience continues. But there is no requirement that a defendant be warned specifically or have notice that his conduct could be visited with a criminal as opposed to a civil sanction. *United States v. Joyce*, 498 F.2d 592, 595 (7th Cir. 1974). "One who defies the public authority and willfully refuses his obedience, does so at his peril." *United States v. United Mine Workers of America*, 330 U.S. 258, 303, 67 S.Ct. 677, 701, 91 L.Ed. 884, 918 (1947).

Other circuits have reached varying conclusions in analogous circumstances. The Ninth Circuit has held that notions inherent in due process require positive notification of a possible criminal contempt charge at the time civil contempt sanctions are imposed. *Yates v. United States*, 227 F.2d 848 (9th Cir. 1955), *aff'd* in part, *rev'd* in part, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957)[4]; *Daschbach v. United States*, 254

4. The *Daschbach* case, 254 F.2d 687 (9th Cir. 1958), which followed *Yates*, sheds light on the *Yates* rationale. That court was particularly concerned with the fact that Daschbach, like Yates, had not been notified that his restraint for refusing to answer questions at trial could last only until the end of the trial. The circuit court reasoned that the district court had creat-

ed a false impression of indefinite confinement for contempt which would terminate only when the defendant chose to cooperate by testifying. The court apparently believed that the wrongful impression of indefinite incarceration violated notions inherent in due process. This concern led the panel to require notification of a possible definite penalty for criminal contempt

F.2d 687 (9th Cir. 1958). No authority is cited as the basis for that circuit's conclusion. In contrast, the Seventh Circuit has held that a contemptuous defendant need not be warned, nor even be aware, that his conduct could be visited with a criminal sanction. In *United States v. Seale*, 461 F.2d 345 (7th Cir. 1972), the court rejected a defendant's contention that having been bound and gagged during trial could have relieved him of the reasonable expectation of a criminal contempt penalty for his conduct. Moreover, the Eighth Circuit has noted that there are many instances when individual action may subject an actor to both criminal and civil sanctions. It is not necessary that the actor, at the time he contemplates his act, be certain as to which of the appropriate sanctions will be invoked. *United States ex rel. Shell Oil Co. v. Barco Corp.*, 430 F.2d 998, 1001 (8th Cir. 1970).[5]

■ In our view there is no requirement that preindictment notice need be given an individual, held in civil contempt for his refusal to testify following a grant of immunity, that he could also be subject to a charge for criminal contempt. Appellant had committed the act subjecting him to criminal contempt at the moment he refused to answer questions after being granted immunity. Any remarks later made by Judge Bramwell, when Petito appeared before him for the second time, were after the fact of the contemptuous act. Appellant

had already chosen to disregard the law and risk the consequences. To suggest that he is entitled to notice of those consequences or of the crime he had already committed as a prerequisite to being prosecuted is tantamount to adopting the doctrine—which we recently rejected as unsound[6]—that ignorance of the law is an excuse. We have not been convinced that we should adopt a wholly new procedural right of notice in criminal contempt proceedings.[7]

## II

### Other Issues

We turn finally to the several other issues raised. Appellant argues that he was denied a fair trial because the May 4, 1978 photographs and surveillance report made by Dunn and his associate were unavailable. Since Dunn's testimony constituted the principal proof of perjury, appellant sought these items in order to attack Dunn's credibility.

■ Under the Jencks Act appellant was entitled to production of the surveillance report because it constituted the "statement" of a government witness, Dunn, relating to the subject matter about which the witness had testified, his observation of Petito. 18 U.S.C. § 3500(b) and (e). Appellant did not, however, make a motion for production of the report until after trial and has therefore waived any right to relief

at or about the time coercive restraint is applied.

5. These remarks were made in the context of upholding a criminal contempt conviction against a claim that the controlling statute was unconstitutionally vague.

6. See *United States v. Berardelli*, 565 F.2d 24, 30 (2d Cir. 1977).

7. Before leaving this issue, we comment briefly on arguments made in the lower court and in appellant's brief. Language cited by appellant from *In re Irving*, 600 F.2d 1027 (2d Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979), admonishing restraint in the imposition of criminal contempt penalties, as well as similar and even stronger phraseology in dicta in *Shillitani*, 384 U.S. at 371, 86 S.Ct. at 1536, 16 L.Ed.2d at 628 n.9, does not really bear upon the claim involved in this case. Those remarks

refer to the substantive issue of the propriety of imposing criminal contempt penalties in particular situations. Petito is not questioning the legality of the criminal contempt sanction *per se*; rather, he is making a procedural objection to his supposed lack of notice of that sanction.

References in the briefs and the lower court's opinion to *United States v. Morales*, 566 F.2d 402 (2d Cir. 1977), and Rule 42(b) of the Federal Rules of Criminal Procedure are, likewise, unilluminating. Rule 42(b) and its treatment in *Morales* deal with the notice necessary to apprise an individual that he is at that moment being prosecuted for criminal contempt. The lack of notice Petito complains of involves notice that he might at some future time be prosecuted for criminal contempt. Petito received adequate Rule 42(b) notice in his indictment; his appeal stems from lack of preindictment notice to which he is not entitled.

based on his failure to receive the document at trial. *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir.), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977).

Petito would be entitled to production of the May 4th photographs and negatives if they were "material to the preparation of his defense," Fed.R.Crim.P. Rule 16(a)(1)(C), or created a reasonable doubt about his guilt "that did not otherwise exist," *United States v. Agurs*, 427 U.S. 97, 109–10, 112, 96 S.Ct. 2392, 2400–02, 49 L.Ed.2d 342, 353, 358 (1976). Whether sanctions for nondisclosure of material evidence should be imposed involves a case-by-case assessment of the nature of the evidence sought, its bearing upon critical issues in the case, the reason for its nonproduction and the strength of the government's untainted proof. *United States v. Grammatikos*, 633 F.2d 1013, 1019 (2d Cir. 1980). Where the government's failure to disclose is merely inadvertent or negligent, a new trial is required only if "there is a 'significant chance that [the] added item . . . could have induced a reasonable doubt in the minds of enough jurors to avoid conviction.'" *United States v. Miranda*, 526 F.2d 1319, 1325 (2d Cir. 1975), *cert. denied*, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976), quoting *United States v. Morell*, 524 F.2d 550, 553 (2d Cir. 1975).

Dunn's eyewitness identification of Petito on the night of May 4, 1978 outside of Cavalieri's social club was the proof the government relied on to establish his presence there. This identification was not based on his viewing of the photographs in question. His testimony, apparently believed by the jury, amply supported the conviction. Hence, the photographs were not material to the defense and the failure to produce them does not constitute grounds for a new trial.

Appellant's request for discovery of the wiretap order and its supporting papers and for a hearing on the legality of the order is readily disposed of by *United States v. Morales*, 566 F.2d 402 (2d Cir. 1977), which, on strikingly similar facts, is controlling. In *Morales* appellant was called to testify before a grand jury and refused. He was then granted immunity but again refused to testify on the ground that the questioning was based on evidence seized by illegal electronic surveillance. After an *in camera* examination of the papers the order was found facially valid. Upon his continued refusal to testify, Morales was prosecuted and convicted of criminal contempt.

On appeal we noted that the determination of facial validity at an *in camera* examination was sufficient to require an individual to answer grand jury questions. *Morales*, 566 F.2d at 406; *In re Millow*, 529 F.2d 770, 773 (2d Cir. 1976); *In re Persico*, 491 F.2d 1156 (2d Cir.), *cert. denied*, 419 U.S. 924, 95 S.Ct. 199, 42 L.Ed.2d 158 (1974). We held that there was no right to a suppression hearing since the criminal contempt proceeding, although occurring after the grand jury had disbanded, was so intimately connected with that grand jury as to be a "part of those proceedings." *Morales*, 566 F.2d at 408. Thus, in the instant case appellant did not have the right to discovery of the wiretap order and its supporting papers, or to a suppression hearing on the propriety of its issuance.

Finally, appellant claims admission of the entire grand jury transcript into evidence was error because it was repetitive, cumulative and confusing. He also asserts that the reading of certain selected excerpts to the jury created an impression of greater reluctance to testify on his part than was actually the case. The grand jury minutes were offered to prove Petito's willfulness and state of mind in committing perjury. They bear, as well, on his credibility. As such they were relevant and admissible. Appellant claims not that this evidence was prejudicial or inflammatory, rather, that it was repetitive. Even if admission of repetitive evidence amounted to error, which it did not, this claim would not warrant reversal under the harmless error standard. As for Petito's assertion that the government's selection of excerpts was misleading, he was free to read whatever additional portions he desired to counter any

false impressions he thought were left by the government's choices.

The mandate of the court should issue forthwith.

The judgment of conviction is affirmed.